# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 24, 2023

Lyle W. Cayce
Clerk

No. 20-60676

Flight Training International, Incorporated,

*Petitioner*,

*versus*

Federal Aviation Administration,

*Respondent*.

Petition for Review of an Order of the
Federal Aviation Administration
FAA Order No. 8900.1 CHG 711

Before King, Dennis, and Ho, *Circuit Judges*.[*]

James L. Dennis, *Circuit Judge*:

This case concerns rules and regulations issued by the Federal Aviation Administration (FAA) governing two types of pilot credentials: airline transport pilot (ATP) certificates, which enable pilots to fly for airlines, and type ratings, which authorize pilots to command complex, "type-rated" aircraft. Flight Training International, Inc. (FTI), a provider of flight training courses, wants to offer a course that uses type-rated aircraft

---

[*] Judge Ho concurs in the judgment only.

No. 20-60676

but culminates in the issuance of an ATP certificate without a type rating. A rule issued by the FAA in 2020 prohibits it from doing that, so FTI petitioned us to set aside the rule. *See* 49 U.S.C. § 46110. FTI argues that the rule effectively amends portions of 14 C.F.R. pt. 61, and therefore should have been promulgated only after notice and comment in accordance with the Administrative Procedure Act (APA). We agree, and therefore grant the petition.

## I.

### A.

The FAA regulates civil aviation within the United States and holds authority over the issuance of pilot certificates. *See* 49 U.S.C. § 44702(a). One such certificate is the ATP certificate. *See* 14 C.F.R. § 61.5(a)(1)(vi). A person must hold an ATP certificate to serve as a pilot in scheduled commercial, passenger-carrying operations, such as those offered by major airlines. *See id.* § 121.436(a).

ATP certificates may be issued with or without a type rating. A type rating is an additional credential, "placed on [the] pilot certificate," *id.* § 61.5(b), that allows pilots to command complex aircraft known as type-rated aircraft. *See id.* § 61.31(a)(d). For example, a pilot flying a Boeing 737 passenger plane for a commercial airline must have an ATP certificate with a Boeing 737 type rating. A pilot who is issued an ATP certificate without a type rating can also add a type rating to the certificate at a later date. *See id.* § 61.157(b).

The FAA has promulgated regulations, codified under 14 C.F.R. pt. 61, that govern the processes for obtaining an ATP certificate and adding a type rating to that certificate. An applicant who "satisfactorily accomplishes the training and certification requirements" for an ATP certificate or a type

2

rating, as applicable, is "entitled" to receive that certificate or rating. *Id.* § 61.13(a)(4).

To obtain an ATP certificate, a pilot must pass a "practical test." *Id.* §§ 61.43(a), 61.153(h). The test must cover "areas of operation" listed in the regulations, such as preflight preparation and procedures, takeoff and departure, in-flight maneuvers, landings, emergency procedures, and postflight procedures. *Id.* § 61.157(e).[1] According to the FAA, the tasks that must be completed on a given test will depend on the aircraft used in the test. For instance, a pilot who takes the test in a Boeing 737 with turbojet engines will be required to master more complex procedures and systems than if they had taken the test in a light twin aircraft with wing-mounted propellers. Regardless of whether the test is administered for purposes of issuing an ATP certificate, a type rating, or both, the pilot must: "(1) [p]erform[] the tasks specified in the areas of operation for the airman certificate or rating sought; (2) [d]emonstrat[e] mastery of the aircraft by performing each task successfully; (3) [d]emonstrat[e] proficiency and competency within the approved standards; and (4) [d]emonstrat[e] sound judgment." *Id.* § 61.43(a).

Merely completing a practical test does not automatically entitle a pilot to an ATP certificate. The pilot must also, among other things, possess sufficient aeronautical experience and pass an aeronautical knowledge test. *See id.* § 61.153(f), (g), 61.157(a)(2)(ii). And pilots seeking an ATP certificate to fly multiengine aircraft must complete a training course that includes 30

---

[1]Through further interpretive rulemaking (not challenged here), the FAA has broken these "areas of operation" down into a detailed set of "Tasks" (*e.g.*, "Preflight Assessment," "High Altitude Aerodynamics," "Steep Turns," etc.), which are then divided further into dozens of discrete skills and areas of knowledge that must be tested. *See* FAA, U.S. Dep't of Transp., FAA-S-ACS-11, *Airline Transport Pilot and Type Rating for Airplane: Arman Certification Standards* (June 2019).

hours of academic instruction and 10 hours of flight simulation. *See id.* §§ 61.153(e), 61.156. The FAA characterizes the training requirements for an ATP certificate as "extensive."

A pilot who wishes to add a type rating to an existing ATP certificate or be issued a type rating concurrently with an ATP certificate must "perform the practical test in actual or simulated instrument conditions," subject to exceptions not relevant here. *Id.* § 61.157(b)(3); *see also id.* § 61.157(a)(1) ("The practical test for an [ATP] certificate is given for . . . [a]n aircraft type rating"). Such pilots must also document that they received training in the "areas of operation" for the type rating sought. Specifically, the pilot:

> (1) Must receive and log ground and flight training from an authorized instructor on the areas of operation under [§ 61.157] that apply to the aircraft type rating; [and]

> (2) Must receive a logbook endorsement from an authorized instructor that certifies the applicant completed the training on the areas of operation listed under [§ 61.157(e)] that apply to the aircraft type rating[.]

*Id.* § 61.157(b)(1)-(2). Some pilots applying for type ratings are exempt from these requirements, but only if they "present[] a training record that shows completion" of an "approved training program for the aircraft type rating." *Id.* § 61.157(c).

To summarize: in order to obtain an ATP certificate, a pilot must: (1) pass a practical test; and (2) satisfy various other regulatory requirements. *See id.* § 61.153. To add a type rating to an ATP certificate, a pilot must: (1) pass a practical test, which may be concurrent with the ATP certificate practical test; and (2) satisfy certain training-related prerequisites. *See id.* § 61.157(b).

No. 20-60676

**B.**

FTI is a Texas-based flight training center. Pursuant to a delegation of authority from the FAA, FTI's examiners are authorized to conduct flight tests and "issue temporary pilot certificates and ratings to qualified applicants." 14 C.F.R. § 183.23; *see* 49 U.S.C. § 44702(d)(1) (authorizing the FAA to delegate examination, testing, inspection, and issuance of certificates to "qualified private person[s]" and their employees). Although FTI is a private enterprise, its examiners "represent the Administrator" of the FAA when conducting practical tests for pilot certificates and type ratings. 14 C.F.R. § 61.47(a).

For years, FTI has offered a flight training course which, though utilizing type rated aircraft, culminates in the issuance of an ATP certificate *without* a type rating. This course is shorter and less expensive than FTI's combined course, in which students receive an ATP certificate with a type rating. FTI asserts that the opportunity to offer a standalone ATP course benefits student pilots who wish to defer their type rating until after they have obtained employment with a private airline and determined which particular type rating they need.

The FAA's Denver office approved FTI's standalone ATP course in 2012. However, on February 25, 2019, the Acting Manager of the FAA's Air Transportation Division instructed the Denver office to revoke approval of this program. The Acting Manager found that, because FTI's course was conducted in type rated aircraft, FTI could not issue ATP certificates upon successful completion of the course without also issuing type ratings. The Acting Manager reasoned that "the identical Practical Test Standards are used for both the ATP and the additional type rating" and "[s]uccessful completion of curricula utilizing the type rated aircraft result [*sic*] in the applicant being tested to act as pilot in command of the aircraft." Therefore,

5

No. 20-60676

the Acting Manager concluded, "denial of or failure to issue the type rating in conjunction with the ATP certificate is denying the applicant of a type rating for which all requirements have been met."

The FAA notified FTI of the revocation on March 18, 2019. Although the FAA withdrew that revocation a few months later, it circulated a "policy memo" on December 20, 2019, largely tracking its February 25 communiqué. This new policy memorandum specified that, if a training center offers a practical test in a full flight simulator (FFS) that replicates a type-rated aircraft, the examiner must issue an ATP certificate with the applicable type rating. The memorandum stated that, under § 61.157, "the same practical test is given for an ATP certificate and an aircraft type rating," and therefore "an examiner must issue the ATP certificate with the . . . applicable type rating to an applicant who successfully completes a practical test for an ATP certificate conducted in an FFS which replicates a type rated aircraft."

On June 20, 2020, the FAA amended Order 8900.1 in conformance with the December 20, 2019 policy memorandum. *See* FAA Order 8900.1, Flight Standards Information Management System (FSIMS), *available at* https://drs.faa.gov/browse/ORDER_8900.1/doctypeDetails.[2]    That amendment added the following paragraph to a list of provisions that training center evaluators "must observe:"

> When conducting a practical test for the issuance of a pilot certificate in a type-rated aircraft or simulator, the event should be treated as a concurrent test, and the [training center evaluator] must issue the pilot certificate with the type rating.

---

[2] Order 8900.1 is a public document intended to "standardize the functions" of aviation safety inspectors and "provide consistency to industry stakeholders." FAA Order 8900.1, Vol. 1, Ch. 1, § 1, ¶ 1-3.

6

No. 20-60676

> For example, if the TCE is conducting a practical test for the issuance of an ATP Certificate in a type-rated airplane, the ATP Certificate with the type rating must also be issued if the test is successfully completed.

FAA Order 8900.1, Vol. 3, Ch. 54, § 2, ¶ 3-4355(D)(6)(f) (June 20, 2020). For ease of reference, we refer to this as the "Must-Issue Rule" or the "Rule."[3]

FTI timely petitioned for review of the Rule pursuant to 49 U.S.C. § 46110.[4] FTI argues that the Rule will necessarily force it to violate 14 C.F.R. pt. 61 any time one of its students takes a practical test in a type rated aircraft and qualifies for an ATP certificate but not a type rating. That is because, according to FTI, the regulations would require them to withhold a type rating, while the Rule would obligate them to issue one. FTI argues that, because the Rule contradicts FAA regulations, it is a legislative rule that could only be promulgated after notice and comment procedures in accordance with the APA. *See* 5 U.S.C. § 553. It is uncontested that the Rule was not promulgated through those procedures.

---

[3] While FTI's petition was pending, this paragraph was renumbered and underwent non-substantive changes, which do not affect our analysis. *See* FAA Order 8900.1, Vol. 3, Ch. 54, § 2, ¶ 3-4355(H)(6), *available at* https://fsims.faa.gov/PICDetail.aspx?docId=8900.1,Vol.3,Ch54,Sec2 (codifying the current version of the Must-Issue Rule).

[4] 49 U.S.C. § 46110(a) provides, in relevant part, that "a person disclosing a substantial interest in an order issued by . . . the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator . . . may apply for review of the order by filing a petition for review in . . . the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." Once the petition is transmitted to the Administrator, "the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order[.]" *Id.* § 46110(c). Here, FTI's petition is limited to the Rule as codified in Order 8900.1 and does not challenge any other agency actions. The FAA does not contest jurisdiction, and we independently agree that we possess jurisdiction.

No. 20-60676

The FAA counters that the Rule is consistent with Part 61 and merely clarifies what those regulations already say. As such, the FAA argues, the Rule is "interpretive" and exempt from the APA's notice-and-comment requirement. 5 U.S.C. § 553(b)(A).

## II.

## A.

Under the APA, an agency must provide the public with notice and an opportunity to comment before it issues a final, legislative rule. *See* 5 U.S.C. § 553(b), (c). Under this section, legislative rules are defined by what they are not: "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(A).

An interpretive rule is one that "clarifies, rather than creates, law." *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592, 602 (5th Cir. 1992). Interpretive rules "advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995)). When an agency issues an interpretive rule, it "does not claim to be exercising authority to itself make positive law." *Syncor Intern. Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997).

By contrast, legislative rules "bind the public and courts in a manner indistinguishable from a statute." Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretive Rules*, 52 ADMIN. L. REV. 547, 552 (2000) (citing Kenneth Davis & Richard Pierce, *Administrative Law Treatise* 233 (3d ed. 1994)). Such rules are accorded the "force and effect of law" in the adjudicative process because they are "promulgated pursuant to legislative authority delegated to the agency by Congress." *St. Mary's Hospital, Inc. v. Harris*, 604 F.2d 407, 408 (5th Cir. 1979); *see Chrysler Corp. v. Brown*, 441

U.S. 281, 302 (1979)).  The hallmark of a legislative rule is that it "modifies or adds to a legal norm." *Syncor*, 127 F.3d at 95 (emphasis omitted).[5]

We have previously recognized that that "[i]f a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment to the first; and, of course, an amendment to a legislative rule must itself be legislative." *Clean Water Action v. E.P.A.*, 936 F.3d 308, 314 n.11 (5th Cir. 2019) (cleaned up).  This is consistent with the approach recommended by Judge Williams of the D.C. Circuit, who stated that a rule is properly considered legislative when it "effectively amends a prior legislative rule." *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).[6]  If a rule is legislative in nature, it must pass through notice and comment. *Guernsey Memorial Hosp.*, 514 U.S. at 100 (notice and comment is "required" if a rule "adopt[s] a new position

---

[5] Legislative rules are sometimes called "substantive rules."  In truth, the requirement of notice and comment attaches only to rules that are both "substantive" and "legislative."  A rule may be called "substantive," in the sense that it is neither procedural nor a mere policy statement, if it is binding on the rights and obligations of private persons. *See Texas v. U.S.*, 809 F.3d 134, 171, 176 (5th Cir. 2015), *cert. granted*, 577 U.S. 1101 (2016), *aff'd by an equally divided court*, 579 U.S. 547 (2016).  But such a rule will still be exempt from notice and comment if all that it does is "interpret[]" existing, substantive law.  5 U.S.C. § 553(b)(A).  What makes a rule "legislative" is that it spawns from the agency's congressionally-delegated powers (if any) to create law. *Chrysler Corp.*, 441 U.S. at 302-303.  Such rules bind courts, not because they are entitled to deference, but because they actually *are* law. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019).  In other words, it is only when the agency seeks to *make substantive law* that notice and comment is required (unless Congress has elsewhere excepted the agency from this requirement). *See id.*; *Perez*, 575 U.S. at 96; *Chrysler Corp.*, 441 U.S. at 303.

[6] A word of caution is in order.  The fact that a rule reverses an agency's prior *interpretation* of its regulations does not make the rule legislative. *See Perez*, 575 U.S. at 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").  All that matters under the "effectively amends" test is whether the rule is inconsistent with an underlying legislative rule.

inconsistent with any of the Secretary's existing regulations"). Applying our Circuit's precedent for determining whether a rule is legislative, we conclude that the Must-Issue Rule is a legislative rule adopted without notice and comment as required by the APA.

## B.

Before considering whether the Must-Issue Rule effectively amends Part 61, we pause to address another one of FTI's arguments: that the Rule is legislative because it is "binding on its face" and "withdraws the agency's . . . previously-held discretion." This argument misapplies the proper legal standard.

Whether a rule limits agency discretion is relevant only in determining if the rule is a "general statement[] of policy" under the APA. 5 U.S.C. § 553(b)(A). As we stated in *Texas v. U.S.*:

> We evaluate two criteria *to distinguish policy statements* from substantive rules: whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion.

809 F.3d at 171 (emphasis added) (cleaned up).

The text of the APA makes clear that "general statements of policy" are different from "interpretive rules," and an agency action need only fall under one of these categories to be exempt from notice-and-comment procedures. 5 U.S.C. § 553(b)(A). In contrast to policy statements—which are "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.*, 441 U.S. at 302, n.31)—interpretive rules explain what an agency thinks a statute or regulation actually says. If the law is mandatory, then it is natural for an

agency's restatement of the law to speak in mandatory terms as well.[7]  We therefore join other Circuits in rejecting the proposition that a rule cannot be interpretive if it limits discretion or uses binding language.  *See American Min. Congress*, 995 F.2d at 1111 ("[R]estricting discretion tells one little about whether a rule is interpretive"); *Syncor*, 127 F.3d at 94 (distinguishing policy statements and interpretive rules); *Warder v. Shalala*, 149 F.3d 73, 82-83 (1st Cir. 1998) (interpretive rules may "bind agency personnel"), *cert. denied*, 526 U.S. 1064 (1999); *Metropolitan School Dist. of Wayne Tp., Marion County, Ind. v. Davila*, 969 F.2d 485, 493 (7th Cir. 1992) ("All rules which interpret the underlying statute must be binding because they set forth what the agency believes is congressional intent"), *cert. denied*, 507 U.S. 949 (1993); *see also* John F. Manning, *Nonlegislative Rules*, 72 GEO. WASH. L. REV. 893, 919 n.36 (2004) (discussing judicial developments and concluding that "a lack of binding effect is no longer the distinguishing feature of interpretive rules").

FTI cites no contrary holding from this Circuit.  In *Texas v. U.S.*, 787 F.3d 733 (5th Cir. 2015), the Court held the Government failed to make a strong showing that the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program did not require notice and comment.  *See id.* 762-67.  But the Court's discussion of agency "discretion" was limited to "[t]he government's main argument . . . that DAPA is a policy

---

[7] To illustrate: 18 U.S.C. § 922(d) makes it unlawful to sell or transfer a firearm if there is "reasonable cause to believe" that the recipient "is an unlawful user of or addicted to any controlled substance."  In 2011, the Bureau of Alcohol, Tobacco, Firearms, and Explosives published an open letter discussing whether a person who holds a medical marijuana registry card, in a state that authorizes marijuana for medicinal use, is prohibited from receiving a firearm.  The ATF answered in the affirmative, telling licensees that "you *may not* transfer firearms or ammunition" to such persons.  ATF, U.S. Dept. of Justice, Open Letter to All Federal Firearms Licensees (Sept. 21, 2011) (emphasis added).  Because the statute imposed a mandatory rule, the ATF's letter did so as well.  But that did not make it a legislative rule.  To the contrary, the Ninth Circuit held that it was "textbook interpretive."  *Wilson*, 835 F.3d at 1100.

statement." *Id.* at 763-65. Moreover, the decision confirmed that the presence or absence of agency discretion was irrelevant to other types of rules exempt from notice-and-comment under § 553, such as procedural rules. *See id.* at 765. In a later decision arising out of the same litigation, the Court again addressed whether it was substantially likely that the DAPA memorandum withdrew agency discretion, but only in the context of determining whether it was a "policy statement," not an interpretive rule. *Texas*, 809 F.3d at 171-76.

In *Texas v. E.E.O.C.*, 933 F.3d 433 (5th Cir. 2019), the Court addressed the "jurisdictional" question of whether agency guidance was a "final agency action." *Id.* at 441. There the Court stated that "withdrawal of discretion distinguishes a policy statement . . . from a final agency action." *Id.* at 442. Nothing in this passage considered "interpretive rules" in the context of § 553.[8]

Finally, in *Texas Sav. & Community Bankers Ass'n v. Federal Housing Finance Bd.*, 201 F.3d 551 (5th Cir. 2000), we stated, somewhat imprecisely, that "[n]on-legislative rules . . . 'genuinely leave the agency and its

---

[8] *E.E.O.C.* stated in passing that the guidance had to undergo notice and comment, possibly implying that it was not interpretive. *See* 933 F.3d at 451. The Court cited no authority for this remark, and a close reading shows it was dictum. *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014) ("A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it."). The Court's actual holding rested on narrower grounds: the agency lacked statutory authority to issue the guidance because it was not "procedural." *E.E.O.C.*, 933 F.3d at 439, 451 (quoting 42 U.S.C. § 2000e-12(a)); *see Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 & n.20 (1976) (noting the Equal Employment Opportunities Commission may only issue "procedural regulations" under Title VII). But a rule can be interpretive even if it is non-procedural. *See* 5 U.S.C. § 553(b)(A) (listing "interpretive rules" and "rules of . . . procedure" separately). Indeed, the entire question of notice and comment was irrelevant in *E.E.O.C.*, because that agency *never* has to undergo notice and comment when issuing regulations under Title VII. *See Edelman v. Lynchburg College*, 535 U.S. 106, 114 n.7 (2002).

No. 20-60676

decisionmakers free to exercise discretion.'" *Id.* (quoting *Professionals and Patients*, 56 F.3d at 595). Plucked from context, that statement could be misread to say that any rule that restricts discretion is a legislative rule. But, once again, the Court's analysis focused only on whether the rule was a policy statement. *See id.* Because the Court answered that question in the affirmative, *see id.*, it had no occasion to decide the counterfactual: whether a rule which fails to preserve discretion could nevertheless qualify as interpretive.

In this case, the FAA does not dispute that the Must-Issue Rule restricts agency discretion and is not a policy statement. We do not address the merits of that question, finding it waived. But, for the reasons already noted, this does not preclude the FAA from arguing that the Rule is an interpretive rule.

## C.

As explained in Part II.A, a rule is legislative, not interpretive, if it is irreconcilable with a prior legislative rule. We agree with FTI that the Must-Issue Rule is inconsistent with FAA regulations.

The Rule speaks in no uncertain terms. "[I]f the [training center evaluator] is conducting a practical test for the issuance of an ATP Certificate in a type-rated airplane, the ATP Certificate with the type rating *must* . . . be issued if the test is successfully completed." FAA Order 8900.1, Vol. 3, Ch. 54, § 2, ¶ 3-4355(D)(6) (June 20, 2020) (emphasis added). Therefore, the Rule *mandates* issuance of a type rating upon the satisfaction of, at most, only two criteria:

- The pilot completes an ATP certificate practical test in a type-rated airplane; and
- The pilot otherwise satisfies the prerequisites for an ATP certificate (which are set forth in § 61.153).

No. 20-60676

But as discussed in Part I.A, § 61.157 codifies its own set of criteria for type ratings to be issued concurrently with ATP certificates. Subject to certain exceptions, a type rating may only be issued if:

- The pilot completes a practical test; and
- The pilot otherwise satisfies the training requirements for a type rating (which are set forth in § 61.157(b)(1)-(2)).

14 C.F.R. § 61.157(b). The issue, then, is whether the latter set of criteria, under § 61.157(b), are subsumed by the former set of criteria, established by the Must-Issue Rule. If they are not—that is to say, if it is possible that a pilot would need do something extra under § 61.157(b) to earn a type rating that they would not have to do under the Rule—then the Rule and the regulations conflict, and FTI's petition must be sustained.

FTI vigorously contends that the practical test requirements for an ATP certificate and a type rating differ, even when the test is conducted in a type rated aircraft. The FAA denies this with equal vigor. For argument's sake, we grant the FAA's claim that "if the pilot successfully completes the completes the airline transport pilot certificate practical test in a type-rated aircraft, the pilot has also successfully completed the *practical test* for a type rating" (emphasis added). This proposition does not get the FAA across the finish line, though, because the agency must also persuade us that the *training* requirements of § 61.157(b) to obtain a type rating are also satisfied when a pilot completes their practical test in a type-rated aircraft and thereby qualifies for an ATP certificate. It is here that we think the FAA falls short.[9]

---

[9] Critically, the Rule does not say a candidate who takes their practical test in a type-rated aircraft and thereby qualifies for an ATP certificate has merely satisfied the *practical test requirement*—one of several—for a type rating. Nor does the Rule contain any proviso stating that such a candidate may only be issued a type rating if they satisfy the non-

As noted, § 61.157(b)(1) and (2) provide that that a pilot cannot obtain a type rating unless they have "receive[d] and log[ged] ground and flight training from an authorized instructor on the areas of operation under [§ 61.157] that apply to the aircraft type rating" and "receive[d] a logbook endorsement from an authorized instructor that certifies the applicant completed" such training. The FAA argues that the "areas of operation" for which training is required under these provisions are the same as those covered by the ATP certificate practical test, at least when that test is taken in a type-rated aircraft. *See id.* § 61.153(h). But even if that is true, there is a difference between being *tested* on a subject and being *trained* in it. A pilot can theoretically pass a test without having received all necessary training, just as one could theoretically pass a bar examination without having attended law school. But type ratings—like law licenses—require both. Therefore, the practical test given for an ATP certificate does not obviate the training that must be receive under § 61.157(b).

Nor do the other prerequisites for an ATP certificate categorically require pilots to receive the same training as that which is required under § 61.157(b). *See id.* § 61.153 (listing requirements for ATP certificate). The only ATP certificate requirement that even potentially overlaps is the requirement that pilots wishing to fly multiengine aircraft receive a course of academic and flight simulation training. *See id.* §§ 61.153(e), 61.156. But unlike the training contemplated under § 61.157(b) for type rating candidates, nothing in § 61.156 (the multiengine training course for an ATP certificate) specifically references the "areas of operation" listed in § 61.157. *Compare*

---

practical test requirements as well. Instead, it mandates issuance of a type rating then and there. We stress that this would likely be a different case if the Rule contained language ensuring that it did not dilute the requirements for a type rating under § 61.157.

*id.* § 61.156 *with id.* § 61.157(b)(1)-(2).   Moreover, these two regulations require pilots to document their training in different ways.   Under § 61.156, one must "present a graduation certificate from an authorized training provider," whereas under § 61.157(b)(2), one "[m]ust receive a logbook endorsement from an authorized instructor."

The FAA also points to 14 C.F.R. § 142.39, which provides that "[e]ach training program curriculum must meet" various "requirements" set out in Part 142.   We do not perceive how Part 142 aids the agency's position.   While it requires curricula to meet certain standards, such as those pertaining to who may serve as a training instructor or evaluator, *see, e.g., id.* §§ 142.47, 142.55, it does not clearly show that one who qualifies for an ATP certificate after completing a practical test in a type-rated aircraft will have completed the training-related requirements of § 61.157(b).   Simply put, if there are any FAA rules or regulations establishing that this is so, then we are unaware of them, because the agency has not directed them to our attention.

The FAA's argument can also be understood in a different way. Although an ATP certificate does not technically require that a pilot check all the boxes under § 61.157(b), the agency appears to suggest that this may not matter; the ATP certificate prerequisites are "more extensive than those for a type rating."   In support, the agency gestures not only the training program described in § 61.156, but also the fact that individuals must pass a knowledge test, practical test, and possess a commercial pilot certificate or comparable military or foreign airline credential. *See id.* § 61.153.   The gist is that, because anyone who obtains an ATP certificate after completing their practical test in a type-rated airplane is obviously well-qualified to fly complex aircraft, it is unnecessary that they satisfy the less-onerous requirements of § 61.157(b). But that is a policy judgment, not an act of legal interpretation.   The regulations are unambiguous that "a person who . . . applies for a type rating to be concurrently completed with an airline

No. 20-60676

transport certificate" must perform the tasks listed in § 61.157(b).  If the agency believes that requirement to be redundant in some cases, it must follow notice and comment procedures and promulgate a new regulation.

\* \* \*

The Must-Issue Rule is a legislative rule, but it was not promulgated after notice and comment as required by the APA.  Because the Rule was issued "without observance of procedure required by law," FTI's petition must be granted and the Rule set aside.  *Id*. § 706(2)(D); *see Clark County, Nev. v. F.A.A.*, 522 F.3d 437 (D.C. Cir. 2008) (FAA rule petitioned under 49 U.S.C. § 46110 may be set aside on grounds set forth in 5 U.S.C. § 706(2)).  In light of this disposition, we do not reach FTI's alternative argument that the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## III.

For the foregoing reasons, we GRANT the petition for review and SET ASIDE the Must-Issue Rule.