**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COLUMBIA RIVERKEEPER; COLUMBIA-PACIFIC COMMONSENSE; WAHKIAKUM FRIENDS OF THE RIVER, *Petitioners*, | No. 12-73385 |
| v. | OPINION |
| UNITED STATES COAST GUARD, *Respondent*, | |
| LNG DEVELOPMENT COMPANY, LLC, DBA Oregon LNG, *Respondent-Intervenor*. | |

On Petition for Review of an Order of the
United States Coast Guard

Argued and Submitted
May 12, 2014—Portland, Oregon

Filed August 5, 2014

Before: Arthur L. Alarcón, A. Wallace Tashima,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Jurisdiction / U.S. Coast Guard

The panel dismissed due to lack of jurisdiction a petition for review of the U.S. Coast Guard's issuance of a letter of recommendation to the Federal Energy Regulatory Commission regarding the suitability of the Columbia River for vessel traffic associated with a proposed liquified gas facility and pipeline.

The panel concluded that the court lacked jurisdiction because the Coast Guard's letter of recommendation was not in practice a final agency action under 15 U.S.C. § 717r(d)(1) of the Natural Gas Act, which authorizes judicial review of final agency orders and actions that "issue, condition, or deny any permit, license, concurrence, or approval."

### COUNSEL

Thomas C. Buchele (argued) and Aubrey Baldwin, Earthrise Law Center, Portland, Oregon; Lauren Goldberg, Columbia Riverkeeper, Hood River, Oregon, for Petitioners.

Brian C. Toth (argued) and Robert J. Lundman, Attorneys, Appellate Section; Robert G. Dreher, Acting Assistant Attorney General, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; John T. Dewey, Curtis E. Borland, Frank G. Nolan, and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Bronwyn Douglass, United States Coast Guard, Washington, D.C., for Respondent.

Charles Scott, Fulbright & Jaworski, New York, New York, for Respondent-Intervenor.

**OPINION**

IKUTA, Circuit Judge:

This appeal addresses one of the several administrative proceedings in which Columbia Riverkeeper, Columbia-Pacific Common Sense, and Wahkiakum Friends of the River (collectively Riverkeeper) have attempted to intervene in an effort to prevent LNG Development Company, LLC (doing business as Oregon LNG), from constructing a liquefied natural gas facility and pipeline along the Columbia River in Oregon. As part of the lengthy terminal siting process, the Coast Guard provided the Federal Energy Regulatory Commission (FERC) with a letter of recommendation (sometimes referred to as a LOR) regarding the suitability of the waterway for vessel traffic associated with the proposed facility. Riverkeeper petitions for review of the Coast Guard's issuance of the letter of recommendation, contending that we have jurisdiction under 15 U.S.C. § 717r(d)(1), which authorizes judicial review of agency orders and actions that "issue, condition, or deny any permit, license, concurrence, or approval." Because the letter of recommendation is not such an order or action, we conclude we lack jurisdiction and dismiss the petition for review.

I

Liquefied natural gas (LNG) is natural gas that has been "supercooled into liquid form" and "reheated back into gas form at natural gas terminals" for transport to customers. *Wash. Gas Light Co. v. FERC*, 532 F.3d 928, 929 n.1 (D.C. Cir. 2008). Although the process for liquefying natural gas has been known since the 19th Century and used commercially since the 1950s, interest in transporting LNG for commercial use increased first in the 1970s due to declines in gas reserves, and again more recently. *See* Jacob Dweck, David Wochner, & Michael Brooks, *Liquefied Natural Gas (LNG) Litigation After the Energy Policy Act of 2005: State Powers in LNG Terminal Siting*, 27 Energy L.J. 473, 473 (2006). The supercooling process reduces the volume of the natural gas to 1/600th of natural gas in vapor form, and, according to the Coast Guard, makes transporting liquefied natural gas "the most economical way to import natural gas from overseas." Once natural gas has been liquefied, it can be transported in an LNG tanker to an LNG import terminal, which receives, stores and processes the LNG. These facilities are "typically sited in coastal areas with shipping access." *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 124 (4th Cir. 2008). Because activities involving LNG have a potential for explosions, fires, and spills, federal, state, and local governments have taken steps to regulate the siting and operation of LNG terminal facilities.

A

To understand the role of the Coast Guard's letter of recommendation in the regulatory process, it is necessary to review the historical development of the legal framework for siting LNG terminal facilities. Prior to 2005, different federal

agencies allocated responsibility for regulating LNG terminal facilities amongst themselves by means of interagency agreements, with little guidance from Congress. The Natural Gas Act of 1938 (NGA) authorized FERC's predecessor agency (the Federal Power Commission) to approve the import and export of natural gas, 15 U.S.C. § 717b (1938), and the extension and improvement of transportation facilities, 15 U.S.C. § 717f (1938), but did not reference LNG terminal facility siting responsibility. Beginning in 1968, Congress enacted a series of pipeline safety statutes that gave the Department of Transportation (DOT) authority to issue minimum safety standards for siting new liquefied natural gas pipeline facilities, 49 U.S.C. § 60103. DOT and FERC ultimately entered into an interagency agreement to allocate their respective responsibilities. *See* Memorandum of Understanding between the Department of Transportation and the Federal Energy Regulatory Commission regarding Liquefied Natural Gas Transportation Facilities (1985).

In addition, the Coast Guard asserted authority over siting decisions affecting the safety and security of port areas and navigable waterways under the Ports and Waterways Safety Act, 33 U.S.C. §§ 1221–1236, the Magnuson Act of 1950, 50 U.S.C. § 191, and Executive Order No. 10173, 15 Fed. Reg. 7005 (Oct. 18, 1950). In early 1978, the Coast Guard and a DOT subagency (the Office of Pipeline Safety Operation of the Materials Transportation Bureau) entered into a memorandum of understanding regarding the division of regulatory responsibility over LNG terminals. Believing that the agreement gave it broad regulatory authority, the Coast Guard commenced a rulemaking proceeding and proposed regulations that would require any person siting an LNG facility to obtain a "use permit" from the Coast Guard. Liquefied Natural Gas Facilities, 43 Fed. Reg. 34362, 34365

(Aug. 3, 1978) (proposed 33 C.F.R. § 126.2012). After further congressional action suggested that the Coast Guard's view of its regulatory authority was too broad, the Coast Guard reduced its ambition. Pursuant to a revised memorandum of understanding with DOT, signed in 1986, the Coast Guard proposed revised regulations replacing its proposed "use permit" requirement with a requirement that a project proponent merely secure a letter of recommendation from the Coast Guard. Liquefied Natural Gas Waterfront Facilities, 53 Fed. Reg. 3370, 3377 (Feb. 5, 1988) (proposed 33 C.F.R. § 127.009).

Beginning in the 1990s, there was a rapid increase in efforts to site LNG import terminals. In response to growing safety and environmental concerns, a number of states claimed authority to regulate LNG facilities under specific state LNG statutes or under general environmental, zoning, or construction laws. *See* Parfomake & Vann, Congressional Research Service, *Liquefied Natural Gas (LNG) Import Terminals: Siting, Safety, and Regulation*, at 16–17 (Dec. 14, 2009); *see also, e.g.*, *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 472–73 (1st Cir. 2009); *AES Sparrows Point LNG*, 527 F.3d at 124. California also asserted exclusive authority to regulate LNG facilities that did not impact interstate commerce, claiming that FERC lacked authority under the NGA to regulate such sites. *See, e.g.*, *Re: Sound Energy Solutions*, Notice of Intervention and Protest of the Public Utilities Commission of the State of California, at 7–9, FERC Docket No. CP04-58-000 (Feb. 23, 2004).

In 2004, FERC, the Coast Guard, and a DOT subagency (the Research and Special Programs Administration) responded to the terrorist events of September 11, 2001 by

entering into another interagency agreement to divide regulatory responsibility for the safety and security review of waterfront LNG facilities. This agreement confirmed that FERC had lead regulatory authority for the siting and construction of onshore LNG facilities. The agencies also agreed that FERC would be the lead agency for preparing an environmental impact statement (EIS) under the National Environmental Policy Act (NEPA),[1] 42 U.S.C. §§ 4321–4370h.

In 2005, consistent with this 2004 interagency agreement, the Coast Guard issued a "Navigation and Vessel Inspection Circular," NVIC 05-05, providing guidance for persons "seeking a permit to build and operate a shore-side LNG terminal." The circular confirmed that FERC was responsible for authorizing the siting and construction of onshore LNG facilities, and was the lead agency for the NEPA process. The circular stated that the Coast Guard would serve as a cooperating agency under NEPA, *see* 40 C.F.R. § 1501.6, and would provide FERC with a letter of recommendation (as required in the Coast Guard's 1988 regulations) that set forth its formal evaluation of the suitability of the waterway for LNG marine traffic. According to the Coast Guard, issuing such a letter of recommendation was a "federal action which

---

[1] For all "major Federal actions significantly affecting the quality of the human environment" the responsible official must conduct environmental analyses pursuant to NEPA. 42 U.S.C. § 4332(C). Such analysis must include a "full and fair discussion of [the action's] significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. "Major federal actions" include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a).

requires compliance with NEPA" to the same extent as FERC's authorization for construction and operation of an LNG facility.

Just a few months later, Congress enacted the Energy Policy Act (EPAct) of 2005, Pub. L. No. 109-58, 119 Stat. 594, which finally clarified Congress's intent regarding the division of responsibility for siting and operating LNG terminal facilities. The EPAct resolved a number of important issues. First, the Act amended the applicable section of the Natural Gas Act to give FERC "the *exclusive* authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal," *id.*, § 311, 119 Stat. at 686, codified at 15 U.S.C. § 717b(e)(1) (emphasis added), thereby precluding other federal or state agencies from asserting such authority.

Second, in response to the states' interest in having some control over LNG import terminals within their jurisdiction, Congress took a compromise position. Although Congress's grant of "exclusive authority" to FERC in siting decisions precluded the states' imposition of state law requirements, the EPAct preserved the states' authority under several federal environmental laws to require project proponents to obtain a state compliance certification. *Id.*, § 311, 119 Stat. at 686, codified at 15 U.S.C. § 717b(d). But to prevent states from using this authority to block LNG projects completely, *see* Dweck, Wochner, & Brooks, *supra*, at 483–85 (examining Connecticut's successful efforts to block the Islander East pipeline project using its water quality certification authority under the CWA), the EPAct allowed for federal judicial review of an order or action of a "State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval," Pub. L. No. 109-

58, § 313, 119 Stat. at 689–90, codified at 15 U.S.C. § 717r(d)(1); *see Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 85 (2d Cir. 2006) (stating that legislative history confirms that this provision was enacted to allow expedited federal judicial review of a state's denial of a required federal permit); *see also* Dweck, Wochner, & Brooks, *supra*, at 482–83 (noting that the conflict between Islander East and Connecticut led Congress to enact § 717r(d)).

Finally, the EPAct confirmed that FERC was the "lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with" NEPA. Pub. L. No. 109-58, § 313, 119 Stat. at 689, codified at 15 U.S.C. § 717n(b)(1). It required FERC to promulgate regulations for NEPA compliance that require a pre-filing of LNG import terminal siting applications. *Id.*, § 311, 119 Stat. at 687, codified at 15 U.S.C. § 717b-1(a).

Although the EPAct did not speak directly to the Coast Guard's role in siting LNG facilities, after the EPAct's enactment, the Coast Guard revisited its internal procedures, and issued a new "Navigation and Vessel Inspection Circular," NVIC 05-08, on December 22, 2008. Now understanding that its letter of recommendation was not a final decision, but rather mere advice to FERC (the agency with exclusive authority to make all siting decisions under the EPAct), the Coast Guard determined its letter of recommendation did not "constitute a permitting action and must not impose requirements or conditions mandated by the Coast Guard." Accordingly, the Coast Guard no longer deemed its letter of recommendation to require separate compliance with NEPA. In 2010, Congress confirmed this approach. In § 813 of the Coast Guard Authorization Act of

2010, Congress required "the Secretary of the department in which the Coast Guard is operating" to "make a recommendation, after considering recommendations made by the States, to the Federal Energy Regulatory Commission as to whether the waterway to a proposed waterside liquefied natural gas facility is suitable or unsuitable for the marine traffic associated with such facility." Pub. L. No. 111-281, § 813, 124 Stat. 2905, 2999. This language confirmed Congress's intent to limit the Coast Guard's role in licensing LNG facilities to issuing letters of recommendation.

B

Accordingly, by 2009 (the year the Coast Guard issued the letter of recommendation in this case), the regulatory framework for a party seeking to site an LNG facility was as follows. FERC was the exclusive siting authority and "lead agency" under NEPA. 15 U.S.C. § 717n(b)(1). FERC required an applicant to engage in a pre-filing procedure before filing an application. *See* 18 C.F.R. §§ 153.12, 157.21 (2009). Among other pre-filing steps, the applicant had to file a letter of intent and waterway suitability assessment with the captain of the port[2] of the zone in which the facility would be located, pursuant to 33 C.F.R. § 127.007 (2009) and 18 C.F.R. § 157.21 (2009). After reviewing the letter of intent and accompanying assessment, the captain of the port would issue a letter of recommendation regarding the proposed facility. 33 C.F.R. § 127.009 (2009). Under Coast Guard regulations, a person "directly affected" by the letter of recommendation could "request reconsideration by the Coast Guard officer responsible," *id.* § 127.015(a) (2009), and

---

[2]    A "captain of the port" is the officer so designated by the Commandant of the Coast Guard. 14 U.S.C. § 634(a).

pursue two additional levels of administrative review, *id.* § 127.015 (2009).**[3]**

After the project proponent filed an application with FERC, FERC would undertake an extensive review and consultation process with various federal, state, and local agencies, as well as private parties, and also convene public hearings. *See* 15 U.S.C. §§ 717b(e)(2)(B), 717b-1. This process included the work necessary to comply with NEPA. Other state and federal cooperating agencies assist FERC in preparing an EIS. The project proponent was required to obtain all necessary permits and approvals from state and other federal bodies, and could challenge the denial of any permits or approvals required under federal law in a federal court of appeals. *See id.* § 717r(d)(1). Once this process was completed, FERC could issue a final decision approving or denying the application. *See id.* § 717b(e)(2). FERC could approve the application "in whole or part, with such modifications and upon such terms and conditions" as it found necessary and appropriate. *Id.* § 717b(e)(3).

Upon FERC's issuance of the order, any person could apply for rehearing within 30 days. *Id.* § 717r(a). Within 60 days of FERC's order on the application for rehearing, an aggrieved party could obtain review of the order in the court

---

**[3]** In 2012, the Coast Guard amended its regulations to provide that the letter of recommendation is not appealable because it "is a recommendation from the [captain of the port] to the agency having jurisdiction" and "does not constitute agency action for the purpose of § 127.015 or the Administrative Procedure Act." 33 C.F.R. § 127.009(b) (2012). That regulation does not apply retroactively. *See id.* § 127.009(e) (2012).

of appeals "wherein the natural-gas company to which the order relates is located" by filing a written petition. *Id.* § 717r(b).

II

We now turn to the facts of this case. In 2007, Oregon LNG began the pre-filing process: It made an initial filing with FERC and filed a letter of intent and a preliminary waterway suitability assessment with the captain of the port for Portland for a proposed LNG terminal and pipeline. The letter stated that Oregon LNG intended to construct an LNG facility on the East Skipanon Peninsula, near the confluence of the Skipanon and the Columbia River in Warrenton, Oregon. In August 2007, FERC published a notice of intent to prepare an EIS for the East Skipanon LNG terminal. LNG Development Company, LLC and Oregon Pipeline Company; Notice of Intent, 72 Fed. Reg. 50356 (Aug. 31, 2007).

Oregon LNG filed its formal application for the East Skipanon LNG terminal with FERC in October 2008, prompting FERC to issue a notice of application. LNG Development Company, LLC (d/b/a Oregon LNG); Oregon Pipeline Company, LLC; Notice of Applications, 73 Fed. Reg. 65301 (Nov. 3, 2008). Riverkeeper and other environmental organizations intervened in the FERC proceedings pursuant to 18 C.F.R. § 385.214 on November 17, 2008.[4]

On April 24, 2009, the captain of the port issued the letter of recommendation at issue in this case, and the accompanying analysis for Oregon LNG's East Skipanon

[4] The FERC proceedings are ongoing.

LNG terminal, pursuant to 33 C.F.R. § 127.009. The letter stated the captain's determination "that the applicable portions of the Columbia River and its approaches are not currently suitable, but could be made suitable for the type and frequency of LNG marine traffic associated with this project." The letter of recommendation included the following statement:

> While this letter has no enforcement status, the determinations, analysis, and ultimate recommendation as to the suitability of this waterway, as contained in this letter, would be referenced in concert with a Captain of the Port Order, should an LNG transit be attempted along this waterway without full implementation of the risk mitigation measures.

The analysis accompanying the letter listed additional mitigation measures that were recommended "to responsibly manage the safety and security risks" of the project, while acknowledging that the specifics of each suggested mitigation measure would require "further development through the creation of an Emergency Response Plan as well as a Transit Management Plan."

On May 22, 2009, Riverkeeper and other intervenors requested reconsideration of the letter of recommendation under 33 C.F.R. § 127.015(a) (2009), on the ground that the Coast Guard had failed to comply with NEPA and the

Endangered Species Act (ESA),[5] 16 U.S.C. §§ 1531–44. The captain of the port denied the motion for reconsideration on July 9, 2009, and Riverkeeper filed an administrative appeal, *see* 33 C.F.R. § 127.015(b)(1) (2009), which was denied by a district commander on December 2, 2010.

Thereafter, an assistant commandant denied Riverkeeper's second administrative appeal, *see* 33 C.F.R. § 127.015(c), on August 25, 2012. In his August 25th decision letter, the assistant commandant stated that issuance of the letter of recommendation was not an agency action under the ESA or Administrative Procedure Act (APA), or a "major federal action" under NEPA, because its issuance "carries no legal significance in and of itself," The letter of recommendation was "not a condition precedent for and does not bar FERC" from authorizing the East Skipanon LNG terminal without adopting the captain of the port's recommendations or incorporating any of the mitigation measures. The letter does not "impose any legal requirement on any party to comply with" its recommendations; it is not legally binding on the Coast Guard, any other government agency, or Oregon LNG. Nor does the letter have an impact on vessel traffic, because "[t]he issuance of an LOR neither authorizes, nor prohibits, an LNG carrier from conducting a transit of the waterway" and vessels are not required to obtain Coast Guard transit permits. Rather, the issuance of a captain of the port letter "is separate and distinct from the

---

[5] The ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary." 16 U.S.C. § 1536(2).

recommendations provided in an LOR, which are not enforceable, and the [captain of the port] is not bound by the recommendations contained in the LOR."

Riverkeeper then filed a petition for review here, challenging the letter of recommendation and the August 25, 2012 decision pursuant to 15 U.S.C. § 717r(d)(1) of the Natural Gas Act.  Oregon LNG intervened in the proceedings.

### III

As a threshold matter, we must determine whether § 717r(d)(1) gives us jurisdiction to review Riverkeeper's challenge to the letter of recommendation and the Coast Guard's final denial of Riverkeeper's administrative appeal. Riverkeeper contends that in enacting § 717r(d)(1), Congress intended to create an exception to the general rule that "review of agency action is typically located in the district courts under the APA absent a specific statutory provision to the contrary," *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1148 (9th Cir. 2009).  We review questions regarding our jurisdiction de novo.  *Sandoval-Luna v. Mukasey*, 526 F.3d 1243, 1245 (9th Cir. 2008) (per curiam). "It is to be presumed that a cause lies outside [of federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).

### A

We begin with the text of the jurisdictional statute, which provides in relevant part:

> The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title . . . is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law . . . .

15 U.S.C. § 717r(d)(1).

The statute does not define the terms "order or action" or "permit, license, concurrence, or approval," and so we interpret these words according to "their ordinary, contemporary, common meaning." *Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010) (internal quotation marks omitted).    In making this interpretation, we give due consideration to the context of these words "with a view to their place in the overall statutory scheme." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009) (internal quotation marks omitted).

Neither we nor our sister circuits have defined the phrase "order or action" in § 717r(d)(1).   In interpreting statutes authorizing judicial review of agency decisions, however, the Supreme Court has held that "[t]he strong presumption is that judicial review will be available only when agency action becomes final." *Bell v. New Jersey*, 461 U.S. 773, 778 (1983)

(holding that a statute allowing judicial review of "any action" by the Secretary of Education gives federal courts jurisdiction only over orders or actions that are final); *see also FPC v. Metro. Edison Co.*, 304 U.S. 375, 383–84 (1938) (holding that the word "order" in a section of the Federal Power Act substantially identical to § 717r(b) refers only to final orders).  This long-standing rule of construction reflects the Supreme Court's inference that Congress generally does not intend to "afford[] opportunity for constant delays in the course of the administrative proceeding," such as would arise if courts could review every interim agency order or action. *Metro. Edison*, 304 U.S. at 383.

Nothing in § 717r(d)(1) overcomes this "strong presumption." *Bell*, 461 U.S. at 778.  Congress's intent to authorize judicial review over only final orders or actions is strongly supported by the language of § 717r(d)(1), which limits judicial review to those agency decisions that "issue, condition, or deny any permit, license, concurrence, or approval," the sort of final decisions that occur at the conclusion of an administrative process.  Further, reading § 717r(d)(1) as limiting judicial review to final agency decisions is consistent with the long-standing interpretation of § 717r(b), a related section of the same statute.  Although § 717r(b) permits federal court review of "an order" issued by FERC, the Supreme Court (as well as our sister circuits and our own precedents) read this language as authorizing judicial review only over final orders. *See Consol. Gas Supply Corp. v. FERC*, 611 F.2d 951, 958 (4th Cir. 1979) (considering § 717r(b)); *Atlanta Gas Light Co. v. FPC*, 476 F.2d 142, 147 (5th Cir. 1973) (same); *cf. Metro. Edison Co.*, 304 U.S. at 383–84 (considering language in the Federal Power Act, 16 U.S.C. § 825*l*(b), which is substantially identical to § 717r(b)); *The Steamboaters v. FERC*, 759 F.2d 1382,

1387–88 (9th Cir. 1985) (same); *Papago Tribal Util. Auth. v. FERC*, 628 F.2d 235, 238 (D.C. Cir. 1980) (same).  In adding § 717r(d)(1) to § 717r when it enacted the EPAct, Congress did not give any sign it intended federal courts to exercise a broader scope of review over non-FERC decisions than over FERC decisions.  Finally, the presumption that Congress intended to authorize judicial review over only final agency decisions is supported by the same considerations relied on by the Supreme Court in *Metropolitan Edison Co.*: construing § 717r(d)(1) as allowing judicial review of every interim action of a state or federal agency would "do violence to the manifest purpose of the provision," 304 U.S. at 384, which was to expedite siting decisions, *see Islander E. Pipeline Co.*, 482 F.3d at 85.  Accordingly, we conclude that § 717r(d) authorizes judicial review only over orders or actions that are "final."[6]  An action or order is "final when it imposes an obligation, denies a right, or fixes some legal relationship." *City of Fremont*, 336 F.3d at 914 (internal quotation marks omitted); *see also Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 986–87 (9th Cir. 2006) (same); *Atlanta Gas*, 476 F.2d at 147 (noting an order reviewable under § 717r(b) must be "unambiguous in legal effect" and have "some substantial effect on the parties which cannot be altered by subsequent administrative action").

---

[6] In construing the language of the Federal Power Act, which is substantially identical to § 717r(b), *Papago*, 628 F.2d at 245, we imposed additional requirements for judicial review, holding that a FERC order is subject to judicial review under the Federal Power Act only if "(1) the order is final; (2) the order, if unreviewed, would inflict irreparable harm on the party seeking review; and (3) judicial review at this stage of the process would not invade the province reserved to the discretion of the agency," *City of Fremont v. FERC*, 336 F.3d 910, 913–14 (9th Cir. 2003). We need not address here whether these requirements are also applicable in the § 717r context.

Section 717r(d)(1) limits our review not only to final actions and orders, but also to those that "issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as 'permit') required under Federal law." Although the statute does not define "permit, license, concurrence, or approval," it collectively refers to these terms as "permit," indicating that Congress intended to capture the type of agency determination that grants or denies permission to take some action. *See United States v. Stevens*, 559 U.S. 460, 474 (2010) (applying *noscitur a sociis* canon). The dictionary definition of permit is "a written warrant or license granted by one having authority," Merriam-Webster's Collegiate Dictionary 923 (11th ed. 2003), which is similar to the definitions of the other statutory terms.[7]  Indeed, the terms are often defined by one another. *See, e.g.*, Black's Law Dictionary 1176 (8th ed. 2003) (defining "permit" as "a certificate evidencing permission; a *license*" (emphasis added)); *id.* at 938 (defining "license" as "[a] *permission*, usu. revocable, to commit some act" (emphasis added)).

Accordingly, Congress contemplated that an order or action reviewable under § 717r(d)(1) would be (1) a final agency action or order (2) issuing, conditioning or denying (3) an agency determination (of a sort analogous to a permit) that has the legal effect of granting or denying permission to take some action.

---

[7] *See* Merriam-Webster's Collegiate Dictionary 717 (11th ed. 2003) (defining "license" as "a permission to act"; "a permission granted by competent authority to engage in . . . an activity otherwise unlawful"); *id.* at 259 (defining "concurrence" as "an agreement or union in action"); *id.* at 61 (defining "approval" as "an act or instance of approving" and defining "approve" as "to give formal or official sanction to").

B

Applying this interpretation, the letter of recommendation for the East Skipanon LNG terminal is not a permitting action or order under § 19 of the Natural Gas Act.

On its face, the Coast Guard's letter of recommendation for this terminal is not an agency determination granting or denying permission to take some action. As early as 1986, the Coast Guard recognized that its siting authority was limited and retreated from its position that it was authorized to issue a "use permit" for LNG terminal facilities. Instead, it promulgated regulations allowing it to issue only a letter of recommendation. Congress's express grant of exclusive siting authority to FERC, *see* 15 U.S.C. § 717b(e)(1), further clarified that the Coast Guard lacks authority over siting decisions. Congress is assumed to know existing law, and Congress did not require FERC to obtain or comply with the Coast Guard's letter of recommendation, even though the Coast Guard had begun issuing such letters long before the EPAct was enacted. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

Congress subsequently confirmed that the Coast Guard's only obligation was to "make a recommendation" to FERC as to the suitability of the waterway. Pub. L. No. 111-281, § 813, 124 Stat. at 2999.[8] Because "recommendation" is not

---

[8] Congress passed the 2010 Coast Guard Authorization Act after the Coast Guard issued the letter of recommendation for the East Skipanon LNG terminal but before the final administrative appeal denial. The parties do not dispute that the 2010 statute applies here.

defined, we assume Congress adopted the common meaning of the term "recommendation," which is a suggestion or advisement without decisive authority, *see* Merriam-Webster's Collegiate Dictionary 1039 (11th ed. 2003) (defining "recommendation" as "the act of recommending"); *id.* (defining "recommend" as "to present as worthy of acceptance . . . . ; to endorse as fit worthy or competent . . . ; advise"). Because nothing in the EPAct or the Coast Guard Authorization Act suggests that the Coast Guard's "recommendation" is anything more than expert advice which FERC will use to inform its decision of whether to approve the proposed facility, we conclude the Coast Guard's letter of recommendation for the East Skipanon LNG terminal does not have any conclusive legal effect.[9]  *Cf.* Revision of LNG and LHG Waterfront Facility General Requirements, 75 Fed. Reg. 29420, 29423 (May 26, 2010) ("Recommendations expressed in the [letter of recommendation] represent the Coast Guard's professional input and are provided in the context of the Federal, State, or local jurisdictional agency's proceedings, which provide for participation and public comments."). Because a letter is not a "permit, license, concurrence, or approval," for purposes of § 717r(d)(1), it is therefore not subject to judicial review.

---

[9] To the extent Riverkeeper argues that the final administrative appeal denial was a "final agency action" based on language in 33 C.F.R. § 127.015(d) (2009), we reject this argument, because nothing in the record indicates that the Coast Guard's final decision had the effect of issuing, conditioning, or denying a permit, *see* 15 U.S.C. § 717r(d)(1). Because Riverkeeper did not appeal the action in district court asserting jurisdiction under the APA, which provides for judicial review of final agency actions, *see* 5 U.S.C. § 704, we need not address whether Riverkeeper could have asserted a claim for relief in that context.

Riverkeeper raises several arguments against this interpretation. First, Riverkeeper suggests that if § 717r(d)(1) applies only to final actions relating to permits, and does not apply to the Coast Guard's letter of recommendation, it will do no work in the statutory regime. Since we are to interpret statutes to avoid making any provision superfluous, *Corley v. United States*, 556 U.S. 303, 314 (2009), Riverkeeper argues that such an interpretation cannot be correct. We disagree. The main purpose of § 717r(d)(1) was to allow judicial review of state agencies' denial of certifications required under federal environmental laws. *See Islander E. Pipeline Co.*, 482 F.3d at 85–88 (reviewing state order denying petitioner's application for a Water Quality Certificate). Moreover, the NGA itself makes clear that certain federal agency actions are subject to judicial review under this section; for instance, FERC must "obtain the *concurrence* of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation." 15 U.S.C. § 717b(f)(3) (emphasis added).

Second, Riverkeeper argues that the term "letter of recommendation" is misleading, and as a practical matter, such a letter constitutes a final agency action or order under § 717r(d)(1). We agree that an agency's characterization of its action as being provisional or advisory is not necessarily dispositive, and courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled. Under the APA, for instance, even if the agency does not label its decision or action as final, it may be reviewable if it "has the status of law or comparable legal force" or if "immediate compliance with its terms is expected." *Or. Natural Desert Ass'n*, 465 F.3d at

987. In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court concluded that a biological opinion issued by the Fish and Wildlife Service pursuant to the ESA was an appealable final agency action under the APA because it effectively authorized a federal agency to take endangered species if it complied with the prescribed conditions. *Id.* at 177–78. While styled as an "opinion," the biological opinion had "direct and appreciable legal consequences." *Id.* at 178. Likewise, a document styled as a "guidance document" may amount to a final agency action when it "reflect[s] a settled agency position which has legal consequences." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). By contrast, an agency determination that certain property contains wetlands subject to the Clean Water Act is not a reviewable action under the APA, because that decision does not determine rights or obligations from which legal consequences will flow. *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593–94 (9th Cir. 2008). We have followed the same approach in the NEPA and ESA contexts as well. *See Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) (concluding an agency's incidental take statement was the functional equivalent of a permit and therefore constituted a "major Federal action" triggering NEPA obligations); *cf. Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021–23 (9th Cir. 2012) (en banc) (concluding the Forest Service's decision authorized rather than advised proposed mining activity and therefore triggers ESA requirements), *cert. denied*, 133 S. Ct. 1579 (2013).

Relying on these precedents, Riverkeeper maintains that the Coast Guard's letter of recommendation for the East Skipanon LNG terminal is the functional equivalent of a permit because either (1) the letter of recommendation is in practice a necessary prerequisite for siting of a facility or

(2) the letter of recommendation will effectively regulate vessel traffic along the waterway after the facility's construction. We disagree with both assertions.

First, the record does not establish that obtaining the Coast Guard's approval of the proposed site for an LNG terminal is a necessary prerequisite for siting an LNG facility. Here, the Coast Guard has no enforcement authority over FERC's siting decision, and its letter of recommendation does not produce legal consequences. In *Bennett* and *Appalachian Power*, by contrast, the agency action had a "virtually determinative effect" on the project proponent. *Bennett*, 520 U.S. at 169; *see also id.* at 178 (stating that the Fish and Wildlife Service's biological opinion "alter[ed] the legal regime" to which the federal agency was subject and had the power to preclude the federal agency's ability to go forward with its water reclamation project); *Appalachian Power*, 208 F.3d at 1023 (stating that "through the Guidance, EPA has given the States their 'marching orders'").

Nor does the record support Riverkeeper's argument that, as a practical matter, FERC always complies with the Coast Guard's letter of recommendation, which effectively gives it the force of law. In making this claim, Riverkeeper relies primarily on the First Circuit's decision in *City of Fall River v. FERC*, 507 F.3d 1 (1st Cir. 2007). But Riverkeeper's reliance on *Fall River* is misplaced because in that case FERC gave the person seeking to construct an LNG terminal facility a conditional approval that was subject to the Coast Guard's approval of a vessel transportation plan. *Id.* at 3–5. Under these circumstances, the Coast Guard's approval did have binding effect, because FERC had the plenary authority to make a siting order subject to such a requirement. *See* 15 U.S.C. § 717b(e). But nothing in *Fall River* suggests that

FERC has a firm internal policy to condition its approval upon the Coast Guard's decision, and there is no evidence in the record before us suggesting that FERC has such an entrenched policy generally or imposed such a condition here.

Second, we reject Riverkeeper's claim that the Coast Guard's letter of recommendation will effectively regulate vessel traffic along the waterway after the facility's construction. For this claim, Riverkeeper relies on the captain of the port's statement in the letter of recommendation that "should an LNG transit be attempted along this waterway without full implementation of the risk mitigation measures" the Coast Guard would reference the letter of recommendation's "determinations, analysis, and ultimate recommendation as to the suitability of this waterway" in a "Captain of the Port Order." On its face, this language suggests that the Coast Guard intends to prevent the East Skipananon LNG facility from receiving vessels unless the project proponent complies with the letter's requirements. But the record establishes that the Coast Guard has not taken this position. Most important, the Coast Guard's final administrative decision, dated August 25, 2012, states that mitigation measures in the letter of recommendation are not binding on the captain of the port, and that as a practical matter, the Coast Guard does not and could not regulate the waterways by preventing vessel transit to LNG terminals that failed to obtain an approval letter. In considering the effect of the letter of recommendation, we are bound by the final determination at the higher level of the agency. *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) ("[T]he fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious."); *Bechtel v. Admin. Review*

*Bd., U.S. Dep't of Labor*, 710 F.3d 443, 449 (2d Cir. 2013) (concluding ALJ's error was "beside the point" where the Administrative Review Board recognized the error and explained that it did not affect the case's outcome).[10] Accordingly, we conclude that the letter of recommendation is not in practice a final agency action.[11]

## C

Although the record does not establish that the Coast Guard's letter of recommendation is a final agency order or action "to issue, condition, or deny any permit, license, concurrence, or approval" required under Federal law, 15 U.S.C. § 717r(d)(1), this does not mean that the Coast Guard's recommendations are immune from judicial review.

---

[10] The Coast Guard press release and public relations documents, which also state that Oregon LNG must implement the risk mitigation measures in the Coast Guard's letter of recommendation, merely track the language of the letter, and so do not provide any additional support for Riverkeeper's interpretation. The April 13, 2009 "Executive Brief" cited in Riverkeeper's reply suffers from the same infirmity.

[11] Riverkeeper points to two other documents to support its interpretation of the import of the letter of recommendation, but its arguments are meritless. First, Riverkeeper claims that language in the Bradwood project's final environmental impact statement indicates that LNG tankers must comply with mitigation measures set forth in the Coast Guard's letter of recommendation. Even if we interpreted the Bradwood environmental documents as Riverkeeper urges, the Coast Guard analyzed the Bradwood project under its pre-EPAct guidance document (NVIC 05-05), which is no longer applicable here. Riverkeeper's reliance on a May 2009 letter from the Coast Guard to FERC is likewise misplaced; that letter merely explains that the Coast Guard, not FERC, has jurisdiction over design and equipment requirements on vessels. Nothing in the Coast Guard's letter indicates that the advice contained in a letter of recommendation is binding.

Rather, any Coast Guard recommendation adopted by FERC in its final order, or any failure to adopt such a recommendation, would be reviewable under 15 U.S.C. § 717r(b).  In addition, any final orders regarding vessel traffic issued by the Coast Guard pursuant to its own independent authority will be subject to judicial review as final agency action. *See, e.g.*, *Wong v. Bush*, 542 F.3d 732, 735 (9th Cir. 2008) (considering challenges to rule establishing security zone); *Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.*, 934 F. Supp. 2d 1, 4, 19 (D.D.C. 2013) (considering challenge to a captain of the port's order). But because Riverkeeper has not carried its burden of showing that the letter of recommendation for the East Skipanon LNG terminal is a final agency order or action to issue a permit we lack jurisdiction to consider it or the August 25, 2012 decision affirming the letter.

**DISMISSED.**